Good morning everyone. We're here today for oral argument. We're going to begin with a longer argument in case number one. This has three appeal numbers 22-2674, 23-1014, and 23-3172. It's International Union of Operating Engineers local versus NLRB as well as other parties. We're going to begin with oral argument from the appellant and Mr. Davidson will begin with you. May it please the court. My name is Steve Davidson and I represent Local 150 in this matter. There are two issues that Local 150 is appealing today. Issue number one, whether Riverstone violated 8A3 of the Act and disciplined and discharged replacement worker Matt Kelly. Issue number two, whether the 8A5 violation of the Act applies to replacement workers. With regard to the first issue, the administrative law judge found in Local 150's favor. The board reversed with one of the three members of the panel dissenting. Recognizing that the ALJ found in favor of Local 150 is important because the board's evidence in cases in which it does not accept the ALJ's finding must be stronger than in cases where the findings are accepted. Matt Kelly's trouble started on May 6, 2019 when he revealed himself as a union supporter. He approached his supervisor Scott Skurston with a t-shirt that read Local 150 and asked Scott what he thought of his t-shirt. As the dissent pointed out, Scott Skurston responded, quote, oh geez you've got to be kidding me. Are you taking Joe Elena's place? End quote. Elena was another hand-picked replacement worker hired about the same time Kelly was and he, Matt, Elena came out and revealed himself as a union supporter within two months of being hired. Mr. Davidson, we've got a circumstance as you pointed out where the ALJ rules one way, the board another with the dissent. How do you suggest that we deal with our standard of review given the law with regard to the board? Well, the court does give a deferential standard to the board. However, because there's a dissent in an ALJ finding, opposed to what the majority found, the weight that they give the ALJ, I think they have to give a closer look at the evidence and analyze the evidence from the ALJ's point of view because the ALJ was the person taking the, listening to all the evidence, making all those initial determinations. And I think in this case what occurred. What's your best case for that argument? Because the standard of review is very deferential to the board's decision, so what case can you cite to that points to when there's a dissent or when the board overrules the ALJ, our look at the evidence should be different than if, let's say, the board just affirmed the ALJ across the board. In Holochrome v. NLRB, second circuit case, where I cited that the evidence in cases in which the board does not accept the ALJ's finding must be stronger. I think that sets the standard because when the ALJ hears the case and understands it, the board should be reviewing with the eyes of the board. In this case, what occurred was the majority of the two members overlooked, completely overlooked, a number of factors presented to the ALJ in which the dissent understood. For example, the majority does not even address the issue of the timing of all the discipline, does not address the issue that Matt Kelly was issued five disciplinary notices within four days after revealing himself as a union supporter. Those are the facts that the ALJ understood, that the dissent understood, but the majority just completely glossed over and did not even consider those facts. Is your argument toward the end of a pretext? Yes. And is pretext a factual question or a legal question? I think it's both. The facts in this case, the evidence shows that the timing, the suspicious timing, the volume of the discipline issued, the fact that Scott Skurston, the supervisor, did not discipline anybody for the same tardiness type issues prior to Matt Kelly revealing himself, that Skurston actually was untruthful under oath before the ALJ. All of those are factors that play into the pretext issue. And under right line, the pretext shows that absent, in this case, absent the union activity, there's no way a Riverstone would have terminated Matt Kelly. What do we make of the fact that Mr. Kelly conceded or admitted to all of the various violations that he was accused of from the employer? Judge Lee, thank you for asking that question. He did admit, for example, the boss came up to him and says, hey, you were late. Okay, boss, I was late. That admission is in no way, shape, or form him being disciplined for being late. There's no way you can get around whether you're punching at 6 o'clock or 6.15 or whatever. So I guess I'm trying to, so is your argument that, not that he wasn't late, but that the employer didn't follow the progressive discipline procedures? Correct. Riverstone has a specific procedure where they're supposed to give notice and there's a form that the Riverstone fills out that tells you what happened, when it happened, prior incidents, and all of those factors. They're supposed to, according to their own policy, sit down with the employee, explain that to him, walk that person through that, and then explain what happened and the consequences if it continues. Riverstone did not do that. In fact, they hid the first two tardiness issues until mid, I think it was August 7th, and that was three months after the actual tardiness. But they told him that he was tardy at the time, right? When you say they hid. At the time, there was a discussion that said, hey, you were late, but that doesn't amount to discipline. Prior to May 6th, he was late in that discipline. Prior to May 6th, other employees were late in that discipline. Just because you're late, that doesn't mean you're automatically disciplined for being late. Weren't there some employees that were disciplined for being late after Mr. Kelly was disciplined twice after? But I think that proves our point. Prior to May 6th, you could be late, you'd show up at any time, you could punch it early, you can punch it late, and Riverstone understood that and allowed that. As soon as Matt Kelly explained, hey, I'm a union supporter, then they cracked down on those rules and they were hyper vigilant on all those rules. Is there any evidence in the record that the other person that was disciplined for being late after Mr. Kelly's termination was disciplined because of union activities or union involvement? There's no evidence that that individual was involved or showed his support, visibly showed his support for the union. Would you like to reserve the remainder of your time for rebuttal? Yes, thank you. Very good. Thank you, Mr. Davidson. We'll now move to Mr. Eggers. May it please the court, Arthur Eggers on behalf of Troy Grove and Vermilion Quarries Divisions of Riverstone Group, Inc. Your Honor, in this review we raised several points. One is that the board's finding that permanent replacement workers during a strike have wine garden rights has no reasonable basis in the law, and I would submit to the court that the standard to be applied is that to the extent an NLRB ruling has no reasonable basis in the law, it should be set aside or reversed. The reason for that is because in the IBM Corporation, the NLRB considered, excuse me, the issue as to whether or not unrepresented employees have wine garden rights. The board said no, they don't. A reason given by the board for that is that there's no common interest safeguard, and in this case, dealing with permanent replacement workers, there's even a stronger argument that there's no common interest safeguard. The reason for that is because striking employees want their jobs back. Permanent replacement workers want to keep their jobs. The board has correctly found that creates an inherent conflict. There cannot be a common interest safeguard when there is an inherent conflict. The board has also found that with regard to wine garden rights, shifting the imbalance of power from the employer to the employee, that can't be done in a non-union setting because the union does not have the authority to make things happen. That is even more true with regard to permanent replacement workers because even in this case, the board has found that with regard to wages, hours, terms, conditions of employment, the union can't do anything with regard to permanent replacement workers, and there's a situation we're going to talk about in a few minutes that deals with an alleged unilateral change. The board says no matter how that goes, there's not a unilateral change as to permanent replacement workers because the employer has the right to establish change, wages, hours, terms, and conditions of employment as to those employees. So in consistency with existing law, there should be a finding that there are no wine garden rights with regard to permanent replacement employees. The second point that I'd like to address is the issue as to Riverstone allegedly violating the act by informing an employee, Joe Elena, that he was not being returned to work because, quote, there are no job openings at this time. That's what he was told. It's absolutely clear and unequivocal. Why isn't he coming back to work? There are no job openings. That's what he was told. Then also in the same letter, he was told if you want to sign, if you wish to sign a preferential hiring list, you can do that. There's no necessity at all for putting his name on a preferential hiring list because he was the only one to come back because at the time he wanted to come back, there wasn't an opening. A list is not a name. A list is not one item. That's not a list. A list is something that establishes order, that establishes sequence. One item won't do that. So I guess I'm confused. Why tell him, why give him that information or give him that option? Because the company had established a list in case it needed it, in case there were, there was more than one employee that wanted to come back and there weren't openings. And as long as they had the list, they thought they should give him the choice if he wanted to sign it. Whether he signed it or not didn't matter at all. Now if the company had not brought him back when there was an opening, we'd been had, we'd be having a different discussion and it probably wouldn't go well for the employer. But that's not what happened here. With regard to the third item, which is the punch-in policy, Riverstone had an unwritten policy or a practice of allowing employees to punch in before their scheduled starting time. They could do that. Then what happened was that there was an unprecedented employee abuse of this policy and that is an employer, employee by the name of Matt Lauer, decided that he would punch in 30 minutes early, three days in a row, earlier than any employee had punched in and his reason for doing that was to test whether or not he would get paid. He was gaming the system. And because of that unprecedented abuse, then the employer clarified its policy and said five minutes early. And the reason why it did that is because the way it was doing it before led to the unprecedented employee abuse, just like an Allied Machine Mechanical Company, which we cite in our brief. And it was that unprecedented employee abuse that led to the change in the, not the change, excuse me, led to the clarification of the policy. And an employer responding to unprecedented employee abuse by clarifying a policy is not a violation of the Act. The next item has to do with Jim Misericola. He's a persuader. A persuader is somebody, as the court I'm aware, is hired by an employer to communicate with employees. The employer has the absolute right to communicate with employees as to its thoughts with regard to the union under H.C. of the Act, so long as there aren't threats or promises. There's no allegation in this case at all that there was a threat or a promise. There's no question with regard to what was done by Mr. Misericola. It's not proven, it's not even alleged. So what the employer was doing is exercising its absolute right under H.C. of the Act to communicate with employees. What does the administrative law judge find? What the administrative law judge finds is that the employer, just by employing Mr. Misericola, showed union animus. Just by employing that alone. And that is directly contrary to H.C. of the Act, because the employer had the absolute right to communicate and to employ a persuader to do that. Why does that matter? Because in this case, the administrative law judge also makes a finding that Mr. Misericola stole a picket sign. At hearing, the question is asked of Mr. Misericola, did you remove a picket sign from Troy Grove Quarry or Vermilion Quarry on public property? Answer, no. Well, the testimony is actually much broader than that. It is. It wasn't a single word. Sorry, your honor. Yeah. It goes into another thing. There's some qualification, there's some denial, there's some back and forth. Correct, your honor. I agree. But as to the specific point, did you take the sign? That's the question, that's the answer. And what the administrative law judge finds is that that's a general and hedging denial. Denial meaning denial of the specific allegation put to him about stealing the sign. And it isn't. So the reason why we get to this point, and keep in mind what was said by this administrative law judge about the employment of him, in and of itself, being union animus, is that this judge addressed a credibility finding with the thought in her mind that he was necessarily, you can fill in the word, bad, evil, something. And because of his employment alone, it was union animus. Now, I recognize that this court certainly is very deferential to findings with regard to credibility. I'm aware of that. But I believe the premise of that is that the finding of credibility cannot be influenced by a belief that there's been a violation of the law by the employer, and necessarily, then, something wrong about a persuader. But wasn't there testimony that there were a couple of other employees that were across the street, and the sign was there, you know, this person pulls up in their truck or car, they can't see the sign because it's being blocked, the car leaves, and the sign's gone. And so, that's just a... why isn't that just a straightforward credibility determination, considering the totality of the circumstances of the events of that day? Because what this judge said, this administrative law judge said, is that there was a general and hedging denial. If the judge had based her on what she said, she would have said, no, I didn't, but I think he lied. That would be enough, then? If the judge had only focused on what you spoke of, Your Honor, and just said, I'm just going to think about what these people say they saw, and what happened, and they think happened, and I'm going to make a decision on that basis, we wouldn't be having this discussion now. The reason for this discussion now is because she didn't stop there. She went on to say that what Mr. Misricola gave was a general and hedging denial. That's an important part of her decision. And when she says that, she steps over a line. And the line she steps over is that she makes a determination that the person testifying is a bad guy, is an evil guy, is a reprehensible guy, so bad that just employing him is proof of union animus. I'd like to reserve the remainder of your time, Mr. Eggers. Yes, thank you. Thank you. We'll now move to, you're okay, we'll reset it. Thank you, Your Honor. We'll now move to oral argument from the applee. We'll begin with Mr. Francisco Fitzmaurice. May it please the Court, my name is Brady Francisco Fitzmaurice for the National Labor Relations Board. The Board is here today seeking enforcement of its decision in order, finding that Riverstone violated Sections 885 and 1 of the National Labor Relations Act. I'll turn first to the violation of Section 885. Substantial evidence supports the Board's finding that Riverstone unilaterally implemented, without providing notice and an opportunity to five minutes before their scheduled start time. This is a straightforward analysis. There's no dispute that there was no punch-in policy before January 2019. There's no dispute that there was no notice or opportunity to bargain given, and as counsel for Riverstone stated, there's no dispute that there was a well-established practice of employees punching in as soon as the gate was unlocked and they were let into the facility when they arrived. These facts make out a clear violation of Section 885. By posting the the new policy in January 2019, Riverstone departed from the practice that existed without bargaining with the union. Do we know whether or not the individuals who punched in early were working in that time frame between 540 and 6 a.m.? I don't believe the record reflects that information. What the employees testified to is, once they got to the facility, generally the gate was locked and they were there early, they had to wait for the gate to be unlocked. Once the gate was unlocked, they proceeded in and went to the time clock and punched in. At that point, I'm not sure exactly what happened. There was some testimony about, you know, there being a huddle in the morning to discuss, you know, what work was to be done that day. Riverstone's counsel points to allied mechanical on this It's unfortunate this case was not cited in their opening brief. We would have addressed it in our responsive brief if it had been so. Nonetheless, I'm happy to address it today. In that case, there was policy in place, a written policy that the employer had stating, you may earn overtime for hours worked over 40 hours per week. Then there was an intervening period where there was some time available to be worked on Sundays, during which double pay was available, and during that time, some employees gamed the system and the employer departed from its policy and made payments double time on Sundays, and then made clear, clarified, that you must work 40 hours per week in order to earn any overtime pay. So that clarification was entirely consistent with the existing written policy that had been in place at that employer. The difference is that here, there was no written policy in place, whereas in allied mechanical, there was no change from policy because the clarification was entirely consistent. Here, there was clearly a change. Previously, employees were able to earn overtime for the time before the scheduled shift start, and afterward, they were not able to outside of those five minutes. Now, the board narrowed this 885 violation and clarified that it did not extend to replacement employees hired during the strike. This is a point on which the union disagrees, and first, I'd just like to raise to the court that the union is precluded from raising that claim at this stage of the proceedings. It never urged that objection before the board, and under Section 10e of the Act, the court is jurisdictionally barred from hearing it at this stage. The union disagrees with that contention. I'm happy to rest on our brief. We quoted direct quotes from their answering brief during the administrative proceedings that make clear it during the administrative proceedings, Riverstone urged the board to narrow that violation. The union did not oppose narrowing that violation. What the union said was, this change applied to all employees, including those who are not replacements. Therefore, there is an 885 violation. That's the position that won the day. The board agreed and said, yes, there is an 885 violation, but not as applied to strike replacements. And the reason for that is there is no duty for an employee to bargain, for an employer to bargain over replacement employees. That's been long-standing law at the board, under Detroit newspapers, as well as in this court under capital hustings. But that's with regard to the terms and conditions of employment, right? Correct, Your Honor. The union still represents replacement employees because they're part of the bargaining unit. Absolutely right. Capital hosting also says that. And so this brings us to a point of divergence. And just so, if you can enlighten me, what are some other circumstances that might arise where the union would represent replacement workers, but that doesn't include bargaining with regard to terms and conditions? So like, for example, is there discipline? Can replacement workers ask for union representation? What other context does that come up? So there are two sections of the Act at play here. There's Section 885, you know, which has to do with the duty to bargain. And I think that's what Your Honor's question is about. Under these circumstances, I can't think of any situation where an employer would be required to bargain over replacement employees' terms and conditions. I think that that's clearly set aside by Detroit newspapers, and that's the issue presented here. Section 7 of the Act is another section that gives employees rights to engage in concerted activity for mutual aid or benefit, as well as union activity. And it's from that section of the Act that the Supreme Court drew the Weingarten right to representation during an investigative interview that might lead to discipline. So that leads me to the violation that the Board found that Riverstone denied Matthew Kelly's violated Section 881. So again, that is not an 885 violation, that is an 881 violation, because it interfered or coerced with Mr. Kelly's right to have a union representative present during the investigative hearing. Is there any possibility of a novation or some other substitute agreement? There is this, these facts that this other person is asked, what about this other fellow? Could this union rep, that union rep, still 20 minutes away at the other quarry? How does that affect the Weingarten analysis? I thank you for your question, Your Honor. First, I would note that this question pertains to the application of the Weingarten rights, and Riverstone raises no claim that Weingarten was misapplied here. Riverstone's only claim is that there is no Weingarten right as to replacement employees. So I think that the Court can dispose of the issue there. But to address Your Honor's question more directly, Weingarten requires that the employee be given their chosen union representative. And in this case, the union steward was identified by name in a letter from the union to the employer months before this interview took place. So the employer was well aware of who the steward was that should be present for such interviews. Moreover, that union steward was located at the other quarry, as Your Honor mentions, about 20 minutes away. Well, who else was located at that quarry? The manager who traveled from that quarry to the investigative interview for that day. So what Riverstone did was it invited the manager from the quarry to travel to the interview, but did not invite the union steward. What Weingarten requires in that circumstance is that an employer provide a reasonable time for the steward, for the chosen representative, to arrive. And if it does not wish to do so, it can present the employee with the option not to proceed with the interview, if they so wish. But that option was never presented here. I'll move on to the Section 8A1 violation as to the preferential hiring list. So here, Riverstone interfered with Mr. Elena's unrelinquished right to be recalled to work upon his unconditional offer to return. Under Laid Law, which has been board law for decades, when a striking employee makes an unconditional right to return, they have a right to return to their former job. There is a distinction between unfair labor practice strikers and economic strikers, but I don't think that this case presents that issue. So what we have here is Mr. Elena made an unconditional offer. In response, Riverstone sent this letter to him attaching a preferential hiring list. And I invite the court to take a look at General Counsel Exhibit 6B for the list said that, in order to make an unconditional offer, you should sign this list. The clear implication is that Mr. Elena has not made an effective offer to return to work, unless and until he signs that list. But that's not what the law is. The law says all he has to do is make an unconditional offer to return, which he had done. Under Peerless Pump, the 2005 board case, requiring unnecessary paperwork for an employee to invoke that right, violates Section 8A1. Riverstone, you know, asserts that there was no job available, so the record does not show Mr. Elena was passed over or refused a job to which he was entitled. That's fine. There's no contention that Mr. Elena was passed over. Section 8A3 deals in discrimination under the Act. If he had been passed over and denied a job, perhaps we would be dealing with the that's not what we have here. All we have is a violation of Section 8A1, which states that it's unlawful for an employer to interfere with employees in the exercise of their rights under the Act. And unnecessary paperwork in invoking a striker's unrelinquished right to return to work does exactly that. Could we hear from you, Counsel, on whether or not Mr. Kelly would have been discharged anyway? The whole idea, there's argument offered that ALJ is going one way, the Board is split on that. Your thoughts? Yes, Your Honor. At the end of the day, the standard to be applied by this Court is the substantial evidence standard. Does substantial evidence support the Board's finding that Riverstone carried its burden to show it would have disciplined and discharged Mr. Kelly even absent his union activity? And the record here is clear on Mr. Kelly's infractions. He does not dispute that he was late multiple times, that he committed other infractions, using a cell phone while driving a truck, going into a shop while he should have been working in a pit, things of that nature. And so the only question is, assuming that there was a motivating factor of his union activity, that was a motivating factor in his discipline of discharge, let's assume that's the case, that's what the Board did. Even so, would Riverstone have taken the same action? And the record says that yes, they would have. He committed these infractions, the progressive discipline was issued in accordance with policy, he was disciplined four times for attendance within a 12-month period, got a first warning, a second warning, a final warning, and then discharge. That's what the policy requires and that's what Riverstone did. What do you make of the procedures in issuing a disciplinary notice, allowing him to have a hearing to contest it, etc., etc.? So yes, the record does show that Riverstone did not actually hand the discipline forms to Mr. Kelly contemporaneously in every instance. But on the other hand, the record shows that they did counsel him along the way. Whenever he had a violation, there maybe were one or two instances where this did not happen, but overall they let him know that he had company policy. Also, these forms were provided to the Union. The record shows that the Union representative Rousseau did have these forms. At the end of the day, the question is, would Riverstone have taken the same action? Mr. Kelly committed these infractions, admitted to them, and the policy required that he be given this progressive discipline. There are cases that the Union cites where the leads to a finding of pretext, but they're distinguishable from the facts here. In those cases, those are mid-Wilshire and Le Madre. In Le Madre, the company skipped steps in the progressive disciplinary system. That didn't happen here. In mid-Wilshire, there was double counting, meaning an employee was warned, refused to sign the warning because he deemed it illegitimate, he was given a second warning for refusing to sign the first, he refused to sign the second, he was given a second warning. This is a manipulation of the progressive disciplinary system. That's not what Riverstone did here. Same question I posed to Mr. Davidson. Is pretext a legal question, a factual question? Your thoughts on that? I'm happy with the answer that it's both. I mean, it's a legal question, but it requires application of law to the facts. You know, as to the facts that Union Council pointed out, I think he mentioned that some of the disciplinary forms had not been issued contemporaneously and that the procedure had not been followed. The board recognized all those facts. The board did not disregard any facts. In fact, it was part of the analysis that the board disavowed was the legal analysis under Section 883 for Kelly's discipline and discharge. So for questions that involve mixed questions of law and fact, sometimes one of the things we look at is, is it predominantly one or the other, right? Is the finding of a determination of pretext predominantly a factual question with some application of law as a predominantly legal question with some findings of fact? Do you have a position as to on which side of the spectrum or which of that line pretext comes in? I would say closer to the side of the line of a question of fact, and the reason for that is the ultimate question here. Does substantial evidence support that Riverstone would have disciplined or discharged regardless of Union activity? This is a question of fact. What did they do and what would they have done if you excise the Union activity? And I think that the record is strongly shows that they would have discharged it. You know, the board was faced with a scenario here where it had to make a tough call. Either this discipline and discharge was unlawful or it was not. The board found it was not unlawful. The board had come to the other conclusion, I would be standing here asking questions that are at least as difficult as the ones I'm answering today. One last issue to address, this has to do with Mr. Misercola's removal of the Union picket sign. This does come down to a credibility determination and the court is well aware exceptional circumstances are required to overturn a credibility determination. There were two witnesses who clearly testified to Mr. Misercola's conduct that day. They were 50 to 80 yards away. They were the employees who placed the sign there. As soon as Mr. Misercola left, one of them went over and saw that the sign that was gone, saw the tracks in the mud from Mr. Misercola's truck, and the judge and the board affirmed that those employees testified credibly. Mr. Misercola did not. It's true that he gave a one-word response in responding to the questions of whether he had ever removed his sign. His direct examination was I think two or three questions long, but I draw the court's attention to his subsequent testimony and cross. That's a transcript 313 to 317. He was first evasive as to the simple question of how long he'd worked for Riverstone and what services he provided to them. He was later hedging on the very clear question of whether he had ever driven off the road when leaving Riverstone's facility. The judge was well within her well-reasoned analysis to find that his denial as to those points was hedging and discredited him as a result. As for her finding that Riverstone harbored anti-union animus as a result of employing Mr. Misercola, this is not relevant to the 8A1 violation that we have before the court today. That came up in the judge's 8A3 analysis as to whether Mr. Kelly was disciplined and discharged for union activity. Animus has no bearing on an 8A1 violation, so I see no reason why the court should be concerned with it. Riverstone was well within its rights to employ Mr. Misercola as a persuader. It has a right to do so under Section 8C. The board did not say otherwise. I see that I have two minutes remaining. I think that I've covered all the points that I intended to. Unless the court has additional questions, I thank you for your time and the board requests full enforcement. Thank you, counsel. We'll now move Ms. Friedman to you. May it please the court, Andrea Friedman with the Department of Justice, and I'm here on behalf of the National Labor Relations Board attorneys who have appeared in this case in their personal capacities, and I'm here solely to for sanctions that was filed by the union, and I don't plan to take very much time. I have two really brief points on this issue. The first is that the issue raised in the motion for sanctions is really just a merits dispute. It's obvious from the briefing, especially the union's reply that this is this is a garden variety merits dispute, and this issue is one that the court is here to discuss with regard to the pension policy and the 10e argument, and I won't rehash that as he is, of course, the expert on that. The second point I want to make is that personal sanctions, personal monetary sanctions against the board attorneys in this case would be an extreme measure and is clearly unwarranted. The case law is really clear. Egregious conduct is what we're talking about with personal monetary sanctions. The examples that we can see in precedent, they usually involve repeated prior warnings from the court or an utter absence of any legal authority whatsoever, and that's just not the case here. You know, prior courts that have issued sanctions have also ignored or have, excuse me, denied requests for sanctions, have pointed out that even a thing is a frivolous or bad faith argument, and this isn't even a long shot here. The board hasn't made a long shot argument here, as the board counsel has explained in its briefing and in its argument here today. The board has a meritorious argument here, so there's just been no abuse of judicial process here whatsoever, and sanctions, the sanctions motion should be denied. Thank you very much, Ms. Freedman. Thank you. We're now going to move Mr. Davidson back to you for a buttle argument. Thank you, Your Honors. Addressing what Ms. Freedman just mentioned, we agree that this is a merits dispute, but they filed a motion to arguing that we waived one of our arguments, and in no way, shape, or form did we waive any of our arguments. In fact, in our, we won at the ALJ level, and then when Riverstone filed its exceptions, we answered those exceptions in our answering brief, and at pages 45 through 47, we spell out our argument that this is an 8A5 violation that applies to replacements, as well as striking employees, crossover employees, it applies to everyone. So in no way, shape, or form did we waive that argument. They also mentioned something about us failing to file a motion to reconsider. Well, that's disfavored by this court, and that required under a Seventh Circuit law. A couple of other points I'd like to make is, as far as employees abusing the punch-in, punch-out, punch-in early policy, one of the employees had been doing it for 18 years, not eight years, not eight months, 18 years, and never been told, never been disciplined, never changed. So as far as anybody abusing that situation, it wasn't the case. You know, coincidentally, maybe that's more evidence of a union animus, because the individual, Brad Lauer, who started doing it was a union supporter that the employer knew about, and as soon as he started punching in early, that's when they changed the rule. I take it when someone punches in, it records the time, so you're just not looking at the aggregate time they're at work. It actually set, plainly states what time the person actually put their card into the punch machine. That is correct, your Honor. So when they show up early, they punch in, and then when they leave at the end of the day, they punch out, and it does time stamp their time card. And this industry lends itself to individuals punching in early, because there are some tasks that one individual does, and then the other people come in. So somebody will come in 15, 20 minutes early, get everything prepped, so the second person comes in, so that team starts working. So there is some economy and some business justification for that. Oh, as far as the conflict of interest, absolutely none existing here. There were decertification elections going on at this time, and the more replacement workers voted for the union than against the union, and actually, when we ratified the contract, there were 11 replacements voting and three strikers, and the vote for ratification was unanimous. I see my time has expired. Thank you. Thank you very much, Mr. Davidson. Mr. Eggers, we're now going to move to you for rebuttal argument. May it please the court, with regard to the first point I'd like to mention, which is Allied Mechanical. In Allied Mechanical, two things going on. One is that Allied Mechanical had a written policy with regard to overtime. Overtime over 40. Allied also had a practice of paying employees double on Sunday if the So what changed in Allied Mechanical, just like in our case, is that there was an unwritten policy or practice that was being abused. The overtime over 40 was. What was being abused is employees were getting double time on Sunday without having worked during the week, which Allied felt should happen. So our case is the same as Allied. It was an oral policy or a practice. It was being abused, and it was clarified, and that's what happened. With regard to the second point, which is the point about the Elena and the issue about the preferential hiring list. With Elena, nothing has changed. What is clearly said in the letter is he's not being brought back to work because there are no job openings. That's what he knew. That's what he was told. He was also told that if he wished, he could sign the that imposes an obligation on him to do anything more to come back to work. He has to wait until there's a job opening. He did. He returned to work. Mr. Edgar, the form, though, that they gave him at the top of the document, it has a sentence, right? If there was a group offered to return to work, employees will be placed on this list based upon their date of hire. Doesn't that give the reader some indication that you have to be on the list at some point in time in order to kind of, so that the employer can kind of go down the list and figure out whose turn it is and who's up? Correct, Your Honor. With regard to the language and the preferential hiring list, when there's a group offer to return to work, there wasn't. There's nothing in the evidence that there was a group offer to return to work. There wasn't. The only person that wasn't brought back was Elena, and with regard to the issue of signing that at all, in the information that he's given, it says you may sign it if you wish. There's nothing that says you have to. There's nothing that says it's a qualification return to work at all. With regard to the argument with regard to Misericola and proof of union animus, I appreciate the comment made by the attorney for the NLRB acknowledging that under HC, my client had the absolute right to hire a persuader. There's no doubt about that. It proved nothing other than the fact that my client was exercising a right given to it under the National Labor Relations Act. With regard to the argument that the administrative law judge made the determination of union animus, and therefore necessarily what a bad, evil person Jim Misericola is when addressing a different aspect of this case, means, respectfully, means nothing. The human brain doesn't function that way. None of us have a brain that will allow us to put in one part of our brain that someone is evil, vicious, bad, rotten, probably other words I'm not thinking of, and then somehow seal that off and not let that affect our thinking as to that person when we're making a credibility determination. So I respectfully submit that the court should modify or set aside every part of this NLRB order that makes any finding against my client Riverstone. Thank you. Thank You Mr. Eggers, thank you Mr. Davidson, thank you Mr. Francisco Fitzmaurice, and thank you Ms. Friedman for your oral arguments of the case we've taken under advisement. p. We will now move.